# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 25-00034-EG |
| Clouter Creek Reserve LLC, | Chapter 11 |
| Debtor. | |

## MEMORANDUM OPINION

**THIS MATTER** is before the Court on the motion of the debtor-in-possession ("DIP"), Clouter Creek Reserve LLC ("Debtor"), for authorization to obtain post-petition financing and related relief pursuant to 11 U.S.C. § 364 (the "DIP Motion").[1]  Debtor proposes to borrow up to $2,475,000 from 364 Capital, LLC ("364 Capital") in return for a super-priority lien on nearly all of Debtor's property and super-priority administrative expense status.  Two of the pre-petition secured creditors whose liens Debtor seeks to prime—Lowcountry Private Lending, LLC ("LPL") and Mark A. Mason, Esq. ("Mason") (together, the "Objecting Parties")—jointly objected to the DIP Motion (the "Objection").[2]  A contested hearing was held and attended by Debtor's representative, Shane Sandusky ("Sandusky"); Debtor's bankruptcy counsel; LPL's counsel; Mason and his counsel; and counsel for the Acting United States Trustee ("UST").  The parties introduced various exhibits that were admitted into the record.  The Court also heard testimony offered by Debtor's three witnesses: Sandusky, Debtor's appraiser, and a representative for 364 Capital.  At the conclusion of the hearing, the Court took the matter under advisement.

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  After careful

---

[1] ECF No. 19, filed Feb. 28, 2025.
[2] ECF Nos. 38 (as supplemented by ECF No. 39).

consideration of the evidence presented, the arguments of the parties, and the entire record before

it, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### A. Background on Debtor and Pre-Petition Events

Debtor is a limited liability company incorporated in South Carolina that formerly operated

under the name Ivo Sands, LLC.  Debtor's principal, Sandusky, has been the sole member and

manager of the business since December of 2024, when he bought the 50% interest owned by his

business partner at the time, Michael Colucci ("Colucci").  As indicated in its Chapter 11 voluntary

petition, Debtor is a "single asset real estate" entity, as that term is defined in section 101(51B) of

the Bankruptcy Code.[3]  Debtor owns two parcels of undeveloped real property, identified as TMS

No. 275-00-00-005 and TMS No. 275-00-00-323, which together consists of approximately 16.41

acres bordered by Clements Ferry Road and Clouter Creek in an area of Berkeley County that has

been annexed by the City of Charleston (the "Property").  [Debtor's Ex. 1, at 244; Debtor's Ex. 4,

at 2.]  Debtor acquired the Property in January 2018.[4]  Debtor has spent the past several years

working to turn the undeveloped Property into "entitled" land by obtaining the permits and

approvals needed for the land to be "ground-breaking" ready before vertical improvements can be

made.  These entitlements will ultimately allow for developers to build a marina and a community

of detached single-family homes on the Property.  Other than the revenue generated from selling

---

[3] 11 U.S.C. § 101(51B) provides:

> The term "single asset real estate" means real property constituting a single property or project,
> other than residential real property with fewer than 4 residential units, which generates substantially
> all of the gross income of a debtor who is not a family farmer and on which no substantial business
> is being conducted by a debtor other than the business of operating the real property and activities
> incidental thereto.

No parties have objected to Debtor's designation as a single asset real estate entity.

[4] Sandusky testified at the hearing that Debtor hired Mason, an attorney, to facilitate the transfer of the Property to
Debtor once Debtor reached a settlement with the heirs whose land Debtor had an option to buy.

timber cleared from the Property in 2020, Debtor's income has come from investments, capital contributions, and loans.

On January 23, 2018, Debtor granted Mason a mortgage on the Property in exchange for a loan of $502,953 (the "Mason Loan"). [LPL Ex. E, at 6.] On March 7, 2020, Debtor executed a note and mortgage agreement with LPL, granting LPL a mortgage on the Property. [*Id.* at 3.] In exchange, LPL gave Debtor a loan in the principal sum of $1,865,000 with an interest rate of 14% per annum and a maturity date of March 7, 2022 (the "LPL Loan"). [*Id.*] Per the terms of the mortgage note and agreement, LPL withheld $391,650 from the loan proceeds as interest reserve to pay the interest installments due during the first 18 months of the loan term. [LPL Ex. D, at 1.] Part of the LPL Loan was used to pay off Debtor's prior first and second mortgages. [*Id.*] Additionally, Mason was paid $50,000 from the LPL Loan to subordinate his interest in the Property.[5] [*Id.* at 2.] Mason executed a note modification and subordination agreement with Debtor that was recorded on March 10, 2020. [LPL Ex. E, at 6.] After the LPL Loan reached full maturity, Debtor and LPL executed a modification agreement to extend the loan's maturity date to September 7, 2022.[6] [*Id.* at 4.] On April 22, 2022, Debtor granted Lending HQ, LLC a junior mortgage on the Property in exchange for a loan of $30,000 (the "Lending HQ Loan"). [*Id.* at 6.]

Debtor defaulted on the LPL Loan, and on July 13, 2023, LPL commenced a foreclosure action for the Property with the Court of Common Pleas in Berkeley County, naming Debtor, Mason, and Lending HQ as defendants. [LPL Ex. E.] According to the Objection, a foreclosure

---

[5] While Mason's proof of claim filed with the Court was not entered into evidence, the Court notes that the documents attached thereto, as supported by Sandusky's testimony at trial, indicate the subordination agreement extended the maturity date of the Mason Loan to January 23, 2022, after which point interest would accrue at a compounded interest rate of 18% per annum.

[6] LPL's proof of claim filed with the Court was also not entered into evidence, but the Court notes that the documents attached thereto, as supported by Sandusky's testimony at trial, indicate that the extension of the maturity date was in exchange for an extension fee that was added to the principal balance and interest would accrue on the new principal balance at the rate of 2% per month (*i.e.,* 24% annually).

hearing was held in December of 2024, and the Special Referee for Berkeley County entered an Order of Foreclosure and Sale (the "Foreclosure Order") that was later vacated due to Debtor's filing for bankruptcy two days before the Foreclosure Order was entered.  [Objection ¶ 9.]

## B.  The Bankruptcy Case

On January 6, 2025 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition").  Debtor filed its schedules and statements on January 21, 2025.[7]  Schedule A/B discloses Debtor's interest in the Property with a listed value of $15,200,000 based on an appraisal from December 13, 2023.  Debtor's only other scheduled property interests are: (1) a checking account containing $19,495.96 as of the Petition Date; (2) intangible assets of "unknown" value, identified as a "Permit for 52 single family home site development" and "Permitting for 110 boat slip marina"; and (3) causes of action against Mason, also of "unknown" value.  Schedule D lists three claims secured by the Property: (1) LPL's first priority mortgage claim of $2,902,286.60; (2) Mason's second priority mortgage claim of $1,104,619, which Debtor indicates is disputed; and (3) Lending HQ's third priority mortgage claim of $30,000.[8]  In Schedule E/F, as amended on March 6, 2025, Debtor lists its nonpriority unsecured debt totaling $1,633,507.37—all for either professional services or funds loaned to the business by individuals.[9]  The nonpriority unsecured claims include a claim in the amount of $50,000for pre-petition legal services performed by Shawn French, Esq. of the French Law Firm LLC ("French").

---

[7] ECF No. 7.

[8] The Objection clarifies that if Mason's secured claim is deemed to be "valid and enforceable, then no less than approximately $2,891,183.07 of LPL's debt is secured by a first lien on the Real Property, and the remainder of the LPL Debt (approximately $473,266.44) is secured by a third mortgage lien on the Real Property."  Objection ¶ 7 n.3. Such result would then render Lending HQ's lien a fourth priority mortgage.

[9] ECF No. 26.

Each of Debtor's three pre-petition secured lenders have filed proofs of claim: (a) LPL filed a secured claim in the amount of $3,375,553.04;[10] (b) Mason filed a claim listing a secured amount of $1,134,687;[11] and (c) Lending HQ filed a secured claim for $30,000—totaling $4,540,240.04 in asserted secured debt.[12] Unsecured claims totaling $1,462,527.87 to date have also been filed by JPMorgan Chase Bank, N.A.; Colucci; the Internal Revenue Service; and Geosyntec Consultants, Inc, aka, ATM.[13]

Other than the DIP Motion at issue, Debtor filed applications to employ its bankruptcy counsel, CBRE Valuation & Advisor Services ("CBRE") as appraiser, and French as special counsel[14] to help with legal issues related to the entitlement process. The Court authorized Debtor to employ bankruptcy counsel and the appraiser but, after Mason and the UST objected[15] to the application to employ French as special counsel, that application was withdrawn. Debtor has also filed applications to employ Lempesis Law Firm, LLC and Burr & Forman, LLP as special counsel (respectively, the "Lempesis Application" and the "Burr & Forman Application").[16]

Upon request, the Court entered a Consent Order for Rule 2004 Examination of Debtor (the "Rule 2004 Consent Order"), signed by counsel for Debtor, Mason, and LPL.[17] Through the

---

[10] POC 5-1, filed Mar. 8, 2025. The Court notes that the proof of claim lists the value of the Property as $15,000,000. However, LPL's proof of claim was not presented as evidence in this matter, so the Court does not rely on the assertions made therein to reach its conclusions.

[11] POC 2-1, filed Jan. 30, 2025. Mason's proof of claim states that the claim is secured by the Property as well as an interest in Debtor's marina permit, rights and plan, and reports that together the collateral's value is $6,000,000.00.

[12] POC 4-1, filed Feb. 19, 2025. Lending HQ's proof of claim does not provide an estimated value for the Property.

[13] The bar date to file non-governmental proofs of claim is set for May 8, 2025; the deadline for governmental entities is July 7, 2025.

[14] ECF No. 34.

[15] ECF Nos. 41 and 43, both filed Mar. 27, 2025.

[16] ECF Nos. 50 and 51, both filed Apr. 2, 2025. Debtor wishes to employ Burr & Forman as non-bankruptcy counsel to advise on and assist Debtor with matters of real estate, development, land use, and entitlements. The Court has approved the Burr & Forman Application. ECF No. 74. Debtor wishes to employ the Lempesis Law Firm to pursue an objection to Mason's claim against Debtor and that special counsel is needed for such purpose to provide expertise in the area of legal ethics and attorney malpractice. Mason objected to the Lempesis Application, and a hearing on the matter is scheduled for May 1, 2025.

[17] ECF No. 29, entered March 6, 2025.

Rule 2004 Consent Order, Debtor agreed to produce a list of requested documents and allow Sandusky to be examined by Mason's and LPL's counsel.

The day before the hearing on the DIP Motion, LPL also filed a motion to convert Debtor's case to one under Chapter 7 based on, among other things, Debtor's alleged bad faith (the "Motion to Convert"),[18] which Mason has joined.[19]  The hearing on the Motion to Convert is scheduled for May 1, 2025.  At the hearing on the DIP Motion, the Court asked the parties whether the hearing or a decision to authorize Debtor to incur the DIP financing should be delayed to May 1, 2025 so that the two motions could be heard together.  Debtor's counsel asserted that the matters did not need to be heard concurrently.  LPL's counsel indicated that the timing of the Motion to Convert filing was based on her schedule, not to delay the hearing on the DIP Motion, and she had fully expected the hearing to go forward as scheduled.  Neither of the Objecting Parties requested that the DIP Motion be continued or argued that a decision on the DIP Motion should be stayed until such time as the Court decided the Motion to Convert.  Accordingly, the Court proceeded with holding the hearing on the DIP Motion on April 3, 2025. After the hearing, Debtor also filed its disclosure statement and Chapter 11 plan of reorganization.[20]

### C.  DIP Financing Proposal

The DIP Motion seeks authorization for Debtor to borrow up to $2,475,000 from 364 Capital (the "DIP Loan").  Debtor proposes to use the DIP Loan proceeds to fund certain development "soft costs" for the Property, pay its ordinary monthly operating expenses, and pay post-petition professional fees and other fees that are necessary to both entitle the Property and

---

[18] ECF No. 49, filed Feb. 2, 2025.
[19] ECF No. 63, filed Apr. 9, 2025.
[20] ECF Nos. 58 and 59, filed Apr. 7, 2025.  The hearing on the disclosure statement is also scheduled for May 1, 2025.

Case 25-00034-eg    Doc 81    Filed 04/18/25    Entered 04/18/25 15:37:10    Desc Main
Document      Page 7 of 41

administer this case.  If the proposed security agreement (the "Agreement")[21] is approved, the DIP

Loan will be secured by a super-priority lien on "all of the real and personal property which

[Debtor] owns and all other property interests, real, personal, or intangible of [Debtor], now

existing or hereafter acquired, including, without limitation, contract rights and property interests

acquired post-Closing."  [Debtor's Ex. 1, at 5; *see also* Debtor's Ex. 3, at 3 (definition of the

collateral).]  In other words, the proposed financing would cause the existing lienholders with

interests in the Property to be subordinated by 364 Capital's lien.

As per the proposed terms, interest on the DIP Loan will be drawn monthly from an interest

reserve of $309,375 (the "Interest Reserve") at a fixed rate of 12.5% per annum.  [Debtor's Ex. 1;

Debtor's Ex. 6, at 5; Debtor's Ex. 7.]  The Agreement, as amended and introduced at the hearing

as Debtor's Exhibit 3, provides that the DIP Loan will mature 12 months after the closing date,

unless Debtor exercises the option to extend the loan term for an additional 12 months and pays a

2% extension fee.  [Debtor's Ex. 3, at 3, 6, 8.]  The Agreement further contemplates that Debtor

would be responsible for the payment of a loan servicing fee of 1% of the DIP Loan, to be paid at

closing ($24,750); a commitment fee of 4% of the DIP Loan, also paid at closing ($99,000),

lender's attorney's fees (estimated to be approximately $75,000), and closing costs ($36,875).

[Debtor's Exs. 3 & 7.]

The DIP Motion included a budget proposing how the DIP Loan funds would be used (the

"Original Budget").  [Debtor's Ex. 1, at 21; Debtor's Ex. 2, at 29.]  The budget was subsequently

amended,[22] and Debtor introduced the new budget into evidence at the hearing as Debtor's Exhibit

7 (the "Amended Budget").  The Amended Budget contains four categories of expenses totaling

the amount of the DIP Loan: (1) Soft Costs for various project components totaling $1,150,000;

---

[21] The Agreement, as amended, was filed as ECF No. 77.
[22] ECF No. 78.

(2) Professional Fees totaling $555,000; (3) DIP Loan fees and the Interest Reserve, together

totaling $433,125; and (4) "Other" costs, including closing costs, reimbursement of the DIP Loan

application fee, and a contingency amount, together totaling $336,875. [Debtor's Ex. 7.]

The Objecting Parties jointly filed the Objection to the DIP Motion, requesting that the

Court deny the relief sought. The UST also filed a response to the DIP Motion requesting a revised

budget and indicating that the UST had provided comments to Debtor and 364 Capital that were

ultimately incorporated into the Agreement.[23] At the hearing, counsel for the UST questioned

some of the witnesses but did not articulate any ongoing objections or reservations to the relief

sought in the DIP Motion.

### D.  Arguments of the Parties and Evidence Introduced into the Record

The parties submitted a joint statement of dispute[24] summarizing the issues to be decided

by the Court as follows: (1) whether Debtor has made reasonable efforts to obtain post-petition

financing from other potential lenders on more favorable terms; (2) whether the interests of the

creditors whose liens are being subordinated are adequately protected; (3) whether the terms of the

DIP Loan are fair and reasonable; (4) whether the creditors and estate benefit from the DIP Loan;

and (5) whether the approval of the DIP Loan is a *sub rosa* plan.

Debtor argues that the DIP Loan is necessary to enable it to effectively develop and

implement a plan of reorganization or liquidation. The main purpose for the DIP Loan is to pay

for costs—including engineering, architecture, and professional fees—necessary to obtain the

entitlements (*i.e.* permits and approvals) for development of the Property, which would "unlock"

the Property's value by making it more marketable to developers and increasing its sale price.

---

[23] ECF No. 42, filed Mar. 27, 2025.
[24] ECF No. 48, filed Apr. 1, 2025.

Debtor contends it has made efforts to obtain financing from other potential lenders on more favorable terms to no avail.  Moreover, Debtor asserts that the terms of the DIP loan are competitive and the proposed financing is in the best interest of the estate because it will allow Debtor to propose a plan that ensures both secured and unsecured creditors will be repaid in full. Lastly, Debtor submits that the Objecting Parties are more than adequately protected within the meaning of 11 U.S.C. §§ 364(d)(2) and 361 because the value of the Property alone is at least $15,400,000, as supported by CBRE's valuation, resulting in an equity cushion of over 3.5 times the amount of the pre-petition liens asserted by the Objecting Parties.  At the hearing, Debtor's counsel argued that if the DIP Loan is not approved, the Property may be subject to a quick "fire" sale, which may result in a lower sale price and ultimately jeopardize the ability of unsecured claims to be paid in full.

The Objecting Parties, on the other hand, argue that the DIP Motion should be denied because Debtor has failed to demonstrate that it has been unable to obtain credit on more favorable terms and that LPL's and Mason's interests will be adequately protected if subordinated to 364 Capital's new interest.  The Objecting Parties also assert that the terms of the proposed financing are unconscionable and objectively unreasonable.  Mason's counsel further argued at the hearing that Debtor's ability to reorganize is speculative at best, as there is no guarantee that Debtor can obtain a ground disturbance permit to sell the Property before the DIP Loan balance comes due. According to the Objecting Parties, the proposed financing will not benefit either existing creditors with liens on the Property or the estate as a whole; rather, the only parties who stand to benefit are Sandusky and 364 Capital.  Lastly, the Objecting Parties claim that the DIP Motion is essentially a *sub rosa* Chapter 11 plan that does not meet the requirements of 11 U.S.C. § 1129(b).

At the hearing, the parties introduced various exhibits and the testimony of three witnesses. More specifically, Debtor presented into evidence copies of several documents, which were identified and described as follows: (1) a commitment letter from 364 Capital to Debtor, dated January 20, 2025, and executed by Sandusky and Renzo Renzi, a representative for 364 Capital ("Renzi");[25] (2) the original Agreement filed with the DIP Motion;[26] (3) the amended Agreement;[27] (4) an appraisal report (the "Appraisal") prepared by Chase Jones of CBRE, Inc. ("Appraiser") and dated February 10, 2025;[28] (5) the original proposed order authorizing the DIP Loan, as attached to the DIP Motion;[29] (6) an amended proposed order authorizing the DIP Loan;[30] (7) the Amended Budget;[31] and (8) Sandusky's handwritten notes he prepared in advance of the hearing.[32] Debtor also presented testimony from Appraiser, Sandusky, and Renzi.  The Objecting Parties introduced copies of four documents into evidence: (1) an undated draft Memorandum of Understanding between Debtor, the City of Charleston, and Berkeley County;[33] (2) a Letter of Intent dated October 8, 2023 from K. Hovnanian South Carolina Operations, LLC to Debtor, offering to purchase the Property for $12 million (the "Hovnanian Offer");[34] (3) a Settlement Statement dated March 6, 2020, detailing credits and charges for the initial LPL Loan;[35] and (4) a Summons and Complaint for the Foreclosure Action filed by LPL against Debtor on July 13, 2023 (Case No. 2023-CP-08-01950).[36]

---

[25] Debtor's Ex. 1.
[26] Debtor's Ex. 2.
[27] Debtor's Ex. 3.
[28] Debtor's Ex. 4.
[29] Debtor's Ex. 5.
[30] Debtor's Ex. 6.
[31] Debtor's Ex. 7.
[32] Debtor's Ex. 8.
[33] LPL Ex. B.
[34] LPL Ex. C.
[35] LPL Ex. D.
[36] LPL Ex. E.

### 1. CBRE's Appraisal

Appraiser provided expert testimony regarding the Appraisal he prepared and the methods he used for valuing the Property. Appraiser is a licensed and accredited real estate appraiser with nearly 18 years of experience and generally deals with real estate market trends in coastal South Carolina. He indicated that while he has previously appraised properties with similar characteristics, the Property is unique because of its location, deep water access, and potential for mixed commercial-residential use.

Appraiser concluded that the market value of the Property "as is" as of February 7, 2025 is $15,400,000 ("As Is Value"), and the prospective market value "as entitled" as of February 7, 2026 is $17,500,000 ("As Entitled Value"). [Debtor's Ex. 4, at 2.] The purpose of the Appraisal was to develop an opinion of the "market value"[37] of the Property. In doing so, Appraiser indicated that four methods may be used to determine the market value: sales comparison approach, income capitalization procedures, allocation, and extraction. [*Id.* at 3.] Ultimately, he utilized the sales comparison approach, indicating that "this methodology is typically used for mixed-use sites that are feasible for immediate development." [*Id.* at 5.]

Appraiser indicated that the entitlement process can be quite time consuming, as it can take 1-10 years to complete depending on the scale of development, so there is a lot of inherent value that can be created by getting a site past the entitlement stage. He testified that based on the information provided to him, Debtor had completed about 90% of the process. Appraiser determined the As Entitled Value using a value range[38] extrapolated from four comparable market

---

[37] The Appraisal reflects that the current economic definition of market value is:
> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer . . ."

[38] *See* Debtor's Ex. 4, p. 27-30. The Appraisal states that the comparable sales, after factoring in adjustments for aspects like location and frontage/water amenity, indicated a value range between $1,177,651 and $1,270,574 per

sales, all for properties in the Charleston area sold within the past four years and sharing amenities and qualities similar to those offered by the Property. He then calculated the As Is Value by discounting the As Entitled Value by about 10%—the rate he used to account for the time value of money based on an assumption that the last 10% of the project work would be completed during the 12 months between the valuation dates—and subtracting an estimated $500,000 for the engineering soft costs remaining to reach full entitlement.[39] As the Appraiser explained, the reality is that usually a property would not be sold at the stage the Property is at in the entitlement process—especially given his estimate that 90% of the work has already been done—so the price at which the Property would sell before reaching full entitlement cannot be directly extracted from market data. Thus, Appraiser said his approach was to determine the As Is Value using an investor's perspective and consider how much an investor would discount from the future As Entitled Value.

Appraiser explained that his conclusions as to the Property's value were based on certain assumptions and considerations, a number of which the Opposing Parties questioned on cross-examination: First, the Appraisal assumes that the Property site will be approved for the development of 52 single-family residential lots and 220 wet slips—adding 110 more to the 110 wet slips for which Debtor has already obtained approval. [*Id.* at 2.] Appraiser testified that the scope of his assignment for Debtor was to determine the current and fully entitled values of the Property based on these entitlement figures provided by Sandusky. Appraiser admitted on cross-examination that he would have to reevaluate the valuations if it was determined that the Property

---

highland acre. The As Entitled value was then calculated by taking the average of $1,175,000 x 14.46 (the number of highland acres on the Property) and $1,250,000 x 14.46.

[39] The Appraisal indicates that the discount was applied by multiplying the As Entitled value by a discount factor of 0.909, then subtracting $500,000, and finally rounding down to an even $15,400,000. Debtor's Ex. 4, p. 30. Appraiser testified on cross-examination that he relied on Sandusky's $500,000 estimate as to the remaining soft costs to complete the entitlement process.

was entitled to fewer than 52 residential lots.  Second, Appraiser testified that the overall health of the local economy is a significant factor to consider, as it has a large impact on the real estate market.  While the local market appears to be more stable, he acknowledged that broader economic factors show possible volatility that could impact the Property's value over time.  Appraiser also admitted that a delay in marketing and selling the Property could lead to a decrease in its value. Third, Appraiser testified that the marina and residential plats were valued as one unit based on the assumption that the Property would be sold for mixed commercial-residential development— which Appraiser determined was the highest and best use that would yield the best price for the Property.  Appraiser, however, acknowledged that there are other potential uses for the Property and the marina and residential portions could be sold separately.  Fourth, Appraiser was questioned about his statement in the Appraisal that the Property's "development plan is in the final stages of full entitlement" and his estimate that Debtor had completed 90% of the work needed to achieve full entitlement.  [*Id.* at 9.]  Appraiser explained that his estimate of Debtor's progress was based on his understanding that Debtor's efforts have been ongoing for several years and getting the ground disturbance permit is the last step in the process.  When asked if it could take longer than 12 months for Debtor to achieve full entitlement, Appraiser acknowledged that was a possibility. Finally, Mason's counsel pointed out that the Appraisal did not include any discussion of the legal issues with Clements Ferry Road that Debtor has yet to resolve (the "Road Problem").[40]  Appraiser affirmed that he did not know about the road problems when he completed the Appraisal.

---

[40] Based on evidence in the record and testimony provided at the hearing, it is the Court's understanding that before Debtor can obtain a ground disturbance permit for the Property, Clements Ferry Road needs to be annexed by the City of Charleston and have the proper access easements from property owners bordering the road to bring the road into compliance with City code.  Efforts to resolve the issues with Berkeley County, the City of Charleston, and local heirs property owners have been ongoing for years and appear to be influenced by local politics, which, according to Sandusky, have now changed in a direction that will benefit Debtor.

On cross-examination, Appraiser was also questioned about the Property's marketability and Debtor's efforts to sell the Property.  Appraiser indicated that the Property is currently marketable but is not being actively advertised on typical real estate outlets like the Multiple Listing Service ("MLS").  Responding to questions about the Hovnanian Offer, Appraiser testified that he understood the $12,000,000 offer was to purchase the Property upon full entitlement and Debtor had rejected the offer as being too low.

### 2.  Sandusky's Testimony

Sandusky testified regarding the history of the Property, Debtor's pre- and post-petition efforts to obtain financing, the proposed Amended Budget, and the steps that must be taken to get the Property entitled so that it can be sold and all creditors paid.  Sandusky testified that in December 2024, he negotiated to buy out his former business partner, Colucci, an unsecured creditor in this case.  Sandusky indicated that before Colucci left, Debtor's inability to obtain financing came down to three issues: allegations against Colucci, Debtor's legal dispute with Mason,[41] and the Road Problem.  Sandusky stated that Debtor's association with Colucci made it much more difficult to obtain financing, as Colucci had been indicted for murder and didn't help the "brand."  Before Colucci left, Debtor hired Chad Juranek ("Juranek") to help with contacting lenders to discuss potential financing.  Sandusky testified that Juranek had spoken with about 50-60 banks, and Sandusky was on at least 20 calls with him and the lenders, but they were unable to obtain a loan.  Even after Colucci's buyout, Sandusky said that lenders were still hesitant to get involved with Debtor while the Debtor's dispute with Mason and the Road Problem remained unresolved.

---

[41] Debtor's Schedule A/B lists causes of action against Mason of unknown value as a property interest of the estate, and Schedule D notes that Mason's claim is contested.  ECF No. 7.  Without getting into issues that remain disputed, the Court notes that Sandusky's references to Debtor's "potential litigation" against Mason seem to relate to Mason's past representation of Debtor as its attorney.

Sandusky identified several lenders with whom he and/or his co-developer, Adam
Chapman, had discussed possible financing after Colucci's buyout. Sandusky testified that prior
to filing for bankruptcy, Debtor had received an offer from John Burnside ("Burnside") for a $9
million loan. However, Burnside backed out of the deal on January 4, 2025—two days before the
Petition Date. Sandusky testified that it was his understanding that the deal fell apart largely due
to Debtor's potential litigation with Mason and advice Burnside was given by a third party.
Sandusky indicated that Debtor was also in discussions with Bastion Capital Group, Inc.
("Bastion"). Pre-petition, Debtor paid Bastion $15,000 to complete due diligence as part of the
loan application process. Sandusky testified that he had a signed commitment letter from Bastion,
and based on his understanding of the letter, the loan would accrue interest at a rate of a 14% and
the principal would be enough to pay off Debtor's existing secured creditors; overall, however,
Sandusky testified that the proposed terms were more expensive than the DIP Loan with 364
Capital. According to Sandusky, the negotiations with Bastion continued after Debtor filed for
bankruptcy but ended before Debtor met with 364 Capital. Though his testimony was somewhat
unclear as to the reason negotiations with Bastion ceased, Sandusky suggested that it had
something to do with Debtor's potential litigation against Mason and the Road Problem. Sandusky
also referenced two other individuals he had spoken with post-petition about financing—Brian
Cox, from South Star Capital, and Brian Dublin—who were apprehensive to lend Debtor money
and did not provide commitment letters.

Sandusky testified that he executed the commitment letter with 364 Capital on January 20,
2025. While Debtor has received financing in the past, those loans were on less favorable terms
than those proposed for the DIP Loan. In particular, Sandusky said that the proposed interest rate
of 12.5% is the lowest rate he has ever seen and is better than both the 14% non-default interest

rate charged for the LPL Loan and the 14% interest rate Bastion was offering before the discussions

ceased.  He testified that the average interest rate for the loan offers Debtor received ranged

between 14 and 16%.  As pointed out, LPL and Mason are currently accruing interest on their

claims at the default interest rates of 24% and 18%, respectively.  Additionally, Sandusky said that

the commitment fee of $99,000 that will be paid to 364 Capital under the terms of the Agreement

is cheaper than anything he has seen among the loan terms Debtor has been offered by other

lenders.

　　　As Debtor's counsel addressed each line item of the Amended Budget, Sandusky explained

the purpose of the expense and the rationale for the amount estimated.  He testified that the soft

costs of $1,150,000 are the estimated expenditures left for the engineering, architecture, and other

subcontractor work required to complete the entitlement process.  While acknowledging that the

soft costs in both the Original and Amended Budgets exceeded the $500,000 estimated soft costs

relied upon in the Appraisal, Sandusky explained that the costs have increased due to inflation and

further discussions with contractors as to the work that needs to be done.[42]  Sandusky also testified

that he believed the professional fees included in the Amended Budget are necessary for Debtor's

reorganization and will benefit the estate.  He explained that the expense for "Special Counsel –

Land Use/Zoning" is the estimated amount Burr Forman will incur in attorney's fees and costs for

its work with the City of Charleston and Berkeley County to resolve the Road Problem and obtain

a ground disturbance permit.  He also believed the line item for "Special Counsel – Shawn French"

was appropriate even though Debtor withdrew French's retention application because Debtor has

day-to-day needs for counsel, such as for drafting legal documents, so the funds would still be

---

[42] When questioned further about the discrepancy on cross-examination, Sandusky said he believed the Appraiser might have had incomplete information and may have been relying solely on the estimated engineering costs for the single-family residential plat.

needed and would be performed by someone else.  Sandusky further explained that the proposed "Special Counsel – Ethics/Legal Liability" line item was the amount budgeted for Lempesis to pursue Debtor's legal claims against Mason, which, if successful, would reduce Debtor's secured debt.  All of these fees paid to retained professionals, however, would have to be approved by the Court prior to being disbursed to the various entities.

Sandusky also testified about his opinion of the Property's value and its potential to be sold before becoming fully entitled.  Though he testified that in his opinion the Property is worth more than what is indicated in the Appraisal, he does not believe the Property can be sold "as is" without a ground disturbance permit and an access easement for Clements Ferry Road.  All offers Debtor has received from potential buyers have been contingent on the completion of the entitlement process.  LPL's counsel asked him about the $12 million Hovnanian Offer, which states under "Conditions Precedent" that "[c]losing shall be contingent upon . . . Buyer obtaining, at Buyer's expense, all 'Approvals' . . . [including] the permits and approvals to develop the Property . . . ." [LPL Ex. C, p. 2.]  Sandusky indicated that he understood the terms of the Hovnanian Offer to mean that the sale of the Property would not close until the entitlements were obtained, including the ground disturbance permit.  Said differently, while potential buyers may be willing to undertake the task of obtaining the proper approvals, no money would be paid to Debtor and title would not transfer to the buyer until that was completed.[43]  Sandusky testified that the decision was made not to explore the Hovnanian Offer further because the amount offered was determined

---

[43] At the hearing, the parties disputed whether the $12,000,000 offer was for the Property as is or was contingent upon Debtor obtaining the permits and entitlements needed before it could be developed (in which case the offer would be for the Property as entitled).  The Court reads the Hovnanian Offer to say that the buyer would be responsible for obtaining the remaining entitlements at its own expense.  Accordingly, the buyer was offering $12,000,000 for the property—arguably the pre-entitlement value— as it was when the offer was made but would not close on the sale and transfer the funds to Debtor until the buyer eventually acquired the remaining entitlements.

to be too low given the work completed and the condition that the money would not transfer until the ground disturbance permit was obtained.

Portions of Sandusky's testimony also touched on Debtor's reorganization prospects, including the amount of time he believes Debtor needs to obtain a ground disturbance permit. When the Court asked Sandusky to clarify if it is a "slam dunk" that Debtor will eventually get the ground disturbance permit, Sandusky affirmed that it is because "by right," Debtor is entitled to certain land use zoning. According to Sandusky, Debtor must receive final approval of its residential plans from the Technical Review Committee ("TRC") and resolve the Road Problem before the City of Charleston will issue a ground disturbance permit for the Property. Sandusky testified he is very confident that the work to obtain the ground disturbance permit can be completed within 12 months. He also explained that to resolve the Road Problem Burr & Forman will attempt to work out an agreement with Berkeley County; if they cannot reach a consensual resolution that way, Debtor will file a declaratory action against the heirs property owners to obtain the access easement needed to bring Clements Ferry Road into compliance with local requirements. Based on his discussions with counsel, Sandusky believes the declaratory action would take about 6 months, or 12 months if contested and appealed. Sandusky also testified that Debtor is undergoing the TRC review process to receive approval of the engineering plans for the residential portion of the Property. He stated that the current TRC review process involves completing up to three TRC meetings, after each of which Debtor must incorporate comments from the TRC and resubmit its engineering plans for approval. Debtor had its first TRC meeting on March 20, 2025, and meetings must be held within a specified time frame; accordingly, Sandusky believes Debtor can obtain approval from the TRC within the next year. When Mason's counsel asked what has changed that Debtor will be able to finish the entitlement process in 12

months when it has not been able to complete it after seven years of effort, Sandusky indicated that the new administration for the City of Charleston has a more favorable attitude toward development and the political will to see this get done. No testimony was presented to rebut the time frame for the entitlement process as explained by Sandusky.

### 3. Renzi's Testimony

Renzi testified regarding the terms of the DIP Loan. He is a managing member of 364 Capital, a specialized lending platform with a particular focus on DIP financing in real estate development bankruptcy cases. According to Renzi, he reached out to Debtor's bankruptcy counsel to offer financing after seeing the notice of Debtor's Chapter 11 case commencement. Renzi testified that he is very familiar with the DIP lending market, as 364 Capital continually monitors and analyzes the national market and what DIP loan terms have been approved to remain competitive. He indicated that 364 Capital offered what it believes is competitive and reasonable for DIP loans. For example, 364 Capital is offering a non-default interest rate of 12.5% per annum, while according to Renzi, many DIP loans have been approved with interest rates higher than 14% per annum. Moreover, Renzi testified that the data suggests that the smaller a DIP loan facility is, the higher the total cost-to-capital.

Renzi also discussed the changes made in the amended Agreement, introduced as Debtor's Ex. 3. He noted that 364 Capital worked closely with the UST's Office to address concerns the UST had raised. As explained, the amended Agreement made several accommodations to resolve the UST's concerns and bring the terms into compliance with the local bankruptcy rules.

### CONCLUSIONS OF LAW

To encourage lenders to extend credit to debtors in bankruptcy, Congress provided incentives for post-petition lenders in § 364 of the Bankruptcy Code. *In re Ellingsen MacLean Oil*

19

*Co.*, 98 B.R. 284, 291 (Bankr. W.D. Mich. 1989)[44] (noting that "[a]s a general rule, debtors have a difficult time obtaining financing after filing bankruptcy"); *see also In re Murray Energy Holdings Co.*, No. 19-56885, 2022 WL 993766, at *1 n.3 (Bankr. S.D. Ohio Mar. 31, 2022) (referring specifically to the incentive provided by § 364(d)). Section 364 "authorizes four increasingly burdensome methods by which a trustee or debtor-in-possession may obtain credit or incur debt on behalf of a bankruptcy estate." *Suntrust Bank v. Den-Mark Constr., Inc.* (*In re Den-Mark Constr., Inc.*), 406 B.R. 683, 688 (E.D.N.C. 2009). Section 364(d) provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
> (A) the trustee is unable to obtain such credit otherwise; and
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1); *see also In re Den-Mark*, 406 B.R. at 688-89 & n.7 (noting that § 1107(a) of the Bankruptcy Code gives a debtor-in-possession the same rights as a trustee under § 364). This type of lien securing post-petition debt with property that is already encumbered is an option of "last resort" commonly referred to as a "superpriority" or "priming" lien because it allows the new lender to "prime" (*i.e.* subordinate) existing liens and take a superior priority position. *In re Den-Mark*, 406 B.R. at 688. The debtor has the burden of proving that the requirements of 364(d) have been met. *See In re Packard Square LLC*, 574 B.R. 107, 118 (Bankr. E.D. Mich. 2017) ("The Debtor has the burden of proving such adequate protection, by a preponderance of the evidence."); *First Sec. Bank & Trust Co. v. Vegt* (*In re Vegt*), 511 B.R. 567, 579-80 (N.D. Iowa 2014) (citing cases) ("The Debtors have the burden of proving that the requirements of § 364(d) have been

---

[44] The Court notes that many of the cases cited herein were decided over 20-30 years ago. However, the text of section 364(d) has not changed since it was first added to the Bankruptcy Code, so such opinions interpreting that subsection appear to still be relevant and persuasive. *See* Pub. L. No. 95-598, 92 Stat. 2549, 2574 (1978).

met."); 11 U.S.C. § 364(d)(2) ("In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.").

Courts have articulated certain factors to consider when determining whether to approve a § 364 financing agreement, some of which overlap with the statutory elements of 364(d). Several cases have applied the four-factor test articulated in *In re Western Pacific Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997), under which a debtor-in-possession seeking approval of financing under § 364(c) and/or (d) has the burden to prove:

> (1) the proposed financing is an exercise of sound and reasonable business judgment;
> (2) no alternative financing is available on any other basis;
> (3) financing is in the best interests of the estate and its creditors; and
> (4) no better offers, bids, or timely proposals are before the court.

*In re DB Capital Holdings, LLC*, 454 BR 804, 822 (Bankr. D. Colo. 2011); *In re Farmland Industries, Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003); *In re Dunn*, No. 15-01552, 2018 WL 3655657 (Bankr. N.D. Iowa May 17, 2018) (applying the test in the context of a § 364(c) motion); *see also In re LATAM Airlines Grp.*, 620 B.R. 722, 767 (Bankr. S.D.N.Y. 2020) (articulating the relevant factors as "whether the debtor is unable to obtain unsecured credit under section 364(b)," "whether the credit transaction is necessary to preserve the assets of the estate," and "whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.").[45]

---

[45] Because the proceeds from a loan approved pursuant to § 364(d) generally become property of the estate, some of these factors mirror the standards that apply to proposals for use of estate property outside the ordinary course of business under 11 U.S.C. § 363(b). *See In re Olde Prairie Block Owner, LLC*, 448 B.R. 482, 492 (Bankr. N.D. Ill. 2011) ("By their terms, these statutory standards [under § 364(d)] do not require inquiry into a debtor's proposed use of the funds. However, should authority to borrow be granted, the funds would be property of the estate and subject to usage limitations set out in 11 U.S.C. § 363."); *In re Childers*, 526 B.R. 608, 612-13 (Bankr. D.S.C. 2015) (citations omitted) (articulating the "business judgment test" courts use to review § 363(b) motions, which looks to whether "a sound business purpose exists," whether the proposed transaction is fair, and whether the transaction is in the best interest of the estate).

Here, there are no other financing offers for the Court to consider other than the DIP Loan offered by 364 Capital. Based on the language of § 364(d)(1), the factors applied by other courts, and the grounds raised by the Objecting Parties, the Court will turn its analysis to whether: (1) Debtor is unable to obtain credit otherwise; (2) the Objecting Parties' interests in the Property are adequately protected; (3) the DIP loan is an exercise of sound and reasonable business judgment; (4) the proposed financing is in the best interest of the estate and its creditors; and (5) the DIP loan, if approved, would constitute a *sub rosa* plan.

## I.    Inability to Obtain DIP Financing Pursuant to Other Terms

The first prong of § 364(d)(1) requires that the debtor show it "is unable to obtain such credit otherwise . . . ." 11 U.S.C. § 364(d)(1)(A); *see also In re YL W. 8th Holdings I, LLC*, 423 B.R. 421, 441 n.44 (Bankr. S.D.N.Y. 2010) ("The debtor bears the burden of proof under section 364(d)(1)(A)."). Said differently, for a debtor to obtain credit secured by a lien of senior or equal priority to existing secured debt, § 364(d)(1) "requires the debtor affirmatively to demonstrate, not merely assume, that less onerous post-petition financing was unavailable." *In re Den-Mark*, 406 B.R. at 690; *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) ("Because super priority financing displaces liens on which creditors have relied in extending credit, the debtor must demonstrate to the court that it cannot obtain financing by other means."). The Bankruptcy Code does not provide any guidelines as to what is required to show that the debtor is unable to obtain such credit otherwise, and case law provides little guidance as to the quantity or quality of the evidence. Accordingly, a court's decision as to the extent of "shopping around" to prove a debtor cannot obtain financing without a priming lien must be analyzed on a case-by-case basis. *In re Den-Mark*, 406 B.R. at 691 (citing cases).

In affirming the bankruptcy court's grant of superpriority lien where the trustee had unsuccessfully sought financing from other lenders "in the immediate geographic area," the Fourth Circuit in *In re Snowshoe Co.* concluded that "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (finding no error in the lower court's conclusion that "the trustee had demonstrated by a good faith effort that credit was not available without the senior lien"). Rather, courts have held that a debtor only needs to show that it has made "reasonable efforts" to seek other sources of credit and has been unable to obtain it on any other terms. *See In re Vegt*, 511 B.R at 579 (citing cases).

The Objecting Parties posit that Debtor has presented no evidence, aside from Sandusky's self-serving testimony, that Debtor sought financing from lenders other than 364 Capital and tried to obtain a loan subject to less burdensome terms. Further, they maintain that the documents Debtor produced in advance of Sandusky's 2004 exam were devoid of any documentation of the commitment letters and communications with the lenders that Sandusky referred to in his hearing testimony. In support of their position, the Objecting Parties cite to *In re Beker Industries Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986). In that case, the bankruptcy court found that the debtor had satisfied its burden under § 364(d)(1)(A) by showing it had unsuccessfully approached some 35-40 lenders to obtain financing before filing for bankruptcy and approximately 20 lenders post-petition. *Id.* at 729. To distinguish the facts currently before the Court from those in *In re Beker Industries*, the Objecting Parties suggest that this case is more akin to the facts in *In re Den-Mark*, wherein the District Court for the Eastern District of North Carolina ultimately vacated an order of the bankruptcy court authorizing financing secured by a priming lien, in part because the single asset real estate debtor had "identified no specific investor or lending institution it approached"

except for the existing senior lienholder and the proposed DIP lender.  406 B.R. at 692.  The court in *In re Den-Mark* concluded:

> This Court's examination of the record below leaves the distinct impression that the bankruptcy court's conclusion—that [debtor] had satisfied its burden to demonstrate unsuccessful efforts to obtain less onerous financing—was influenced in large part by [the existing senior lienholder's] election not to extend additional funding for Phases II and III of [debtor's development project].

*Id.* at 693.  The facts before this Court are distinguishable from those in *In re Den-Mark*.  While the debtor in that case did not identify any specific lenders it approached, in his testimony, Sandusky identified at least four lenders from whom Debtor sought financing both pre- and post-petition.

When analyzing a debtor's ability to obtain credit on less onerous terms, courts do not review the evidence in a vacuum; rather, they take a more holistic view of the debtor's circumstances, assessing the sufficiency of a debtor's efforts in light of considerations like the nature of the debtor's assets or business.  For example, in *In re Sky Valley, Inc.*, the bankruptcy court concluded that the debtor satisfied § 364(d)(1)(A) even though it had approached only three lenders other than the pre-petition lienholder.  100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).  In disagreeing with the objecting lienholder's reliance on *In re Beker Industries*—the same case cited by the Objecting Parties—the *In re Sky Valley* court noted:

> In the instant case, however, it would be unrealistic and unnecessary to require Debtor to conduct such an exhaustive search for financing.  Debtor's property is a resort complex valued at approximately $10.5 to $12 million and is located in the North Georgia mountains.  By the nature of the instant proceeding, it is clear that Debtor suffers some financial stress and has little or no unencumbered property.  In such a circumstance, a potentially interested lender is likely either: (a) to hold a pre-petition security interest in Debtor's property and thus, is already at risk; or (b) to do business in the community surrounding the resort and, thus is interest in preserving community land values by preserving Debtor's resort . . . In the instant case, debtor approached both pools of potential lenders unsuccessfully, excepting the proposed offer from Bank South now before the court.

*Id.*

Here, the Court finds Sandusky's testimony provided credible evidence that Debtor's efforts to obtain alternate financing were reasonable under the circumstances and sufficient to prove that financing on less burdensome terms was unavailable.  In addition to the four lenders he identified, Sandusky testified that Juranek had contacted around 50-60 banks on Debtor's behalf before the bankruptcy filing.  Sandusky further testified that none of the prospective lenders offered credit on an unsecured or junior secured basis, and none of the loans offered to Debtor were on better terms than those proposed for the DIP Loan except for Burnside's offer, which Burnside ultimately rescinded.  Sandusky's testimony also touched on circumstances that made obtaining financing unusually difficult, despite the Property's alleged equity cushion.   Like the debtor in *In re Sky Valley*, Debtor has little to no unencumbered property.   Additionally, Sandusky's testimony suggests that lenders have historically been reluctant to work with Debtor due to its prior association with Collucci, its potential litigation with Mason, and the ongoing political and legal issues Debtor and other property owners have faced with getting access easements and annexation approved for Clements Ferry Road.  While some of these circumstances have been ameliorated by Collucci's buyout and the City of Charleston's change in administration, Debtor is now in bankruptcy.

The Objecting Parties raised concerns that despite Debtor's consent to produce certain documents for the 2004 exam, Debtor did not provide any financing commitment letters or communications with potential lenders—documentation that the Objecting Parties suggest is necessary to substantiate Sandusky's testimony.  While the Court questions why Sandusky did not introduce any of such documents into the record, the Court notes that while the documents for production listed in the Rule 2004 Consent Order specifically include "[c]opies of any offers and

communications pertaining to offers to purchase or sell Debtor's property" and "[a]ll loan applications of Debtor and all associate submittals pertaining to any loan sought by Debtor from October 6, 2024 to the present,"  there is no clear request for communications about loan offers or commitment letters from financial institutions.

The Court is also not persuaded by the Objecting Parties' arguments regarding the sufficiency of evidence Debtor provided.  While they suggest that Debtor cannot satisfy its burden under 364(d)(1)(A) because it failed to produce documentary evidence of its efforts, case law has relied on a debtor's representative's testimony as sufficient proof.  *See In re Den-Mark*, 406 B.R. at 691 (noting that "a debtor's testimony alone may be sufficient in establishing the necessity of a post-petition lien"); *In re Vegt*, 511 B.R. at 579-80 (finding that the bankruptcy court's decision to grant a superpriority lien based solely on the Chapter 12 debtor-husband's uncontested testimony that he had unsuccessfully requested financing from 15 to 20 other banks was not clearly erroneous); *In re Dunes Casino Hotel*, 69 B.R. 784, 796 (Bankr. D.N.J. 1986) (finding that based on testimony from the debtor's principal, the debtor had satisfied the first prong of § 364(d)(1)); *In re Antico Mfg. Co.*, 31 B.R. 103, 105 (Bankr. E.D.N.Y. 1983) (finding the testimony of the debtor's president sufficient for the purposes of § 364(d)(1)(A)); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (determining that bankruptcy judge's finding that trustee could not obtain credit otherwise was not clearly erroneous where trustee testified of his unsuccessful efforts to obtain less stringent terms from two national banks).

Based on the testimony presented, the record before the Court suggests that Debtor's unsuccessful efforts to find alternative financing were adequate for the purposes of § 364(d)(1)(A).

**II.     The Property's Equity Cushion Provides Adequate Protection to the Existing Secured Creditors**

To have its DIP Loan approved, Debtor must show by a preponderance of the evidence that even with the priming lien, the pre-petition secured creditors' interests in the Property will be adequately protected.  *In re Packard Square LLC*, 574 B.R. at 118 (citing 11 U.S.C. § 364(d)(2); *Grogan v. Garner*, 498 U.S. 279, 286 (1991)).  "The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."  *In re 495 Central Park Ave. Corp.*, 136 B.R. at 631.  Whether a creditor's interest is adequately protected is a question of fact "rooted in measurements of value and the credibility of witnesses" and is determined on a case-by-case basis.  *In re Williams*, No. 24-03939-HB, 2025 WL 819002, at *4 (Bankr. D.S.C. Feb. 25, 2025) (quoting *R&J Contractor Servs., LLC v. Vancamp*, 652 B.R. 237, 241-42 (D. Md. 2023); *In re Snowshoe Co.*, 789 F.2d at 1088).

Though the Bankruptcy Code does not define the term "adequate protection," courts have consistently looked to § 361 for guidance in determining what constitutes adequate protection for the purposes of § 364(d).  *See, e.g.*, *Resolution Trust Corp v. Swedeland Dev. Grp.* (*In re Swedeland Dev. Grp.*), 16 F.3d 552, 564 (3rd Cir. 1994); *In re Den-Mark*, 406 B.R. at 696; *In re Hollister*, 628 B.R. 154, 158 (Bankr. C.D. Cal. 2021).  As § 361 provides:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by--
>> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that . . . any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. With respect to § 361(3), numerous courts have held 'indubitable equivalent' to mean 'completely compensatory,' or nearly so." *SouthPoint Glob. Invs., LLC v. Warren* (*In re Westport Holdings Tampa Ltd. P'ship*), 607 B.R. 715 (M.D. Fla. 2019) (citing cases); *see also In re Packard Square LLC*, 574 B.R. at 118 ("To be the 'indubitable equivalent' of a secured creditor's interest in property, the proposed adequate protection must both compensate the secured creditor for the present value of that interest, and insure the safety of that interest.").

With such understanding of "indubitable equivalent," courts have found that a debtor's equity alone may adequately protect existing lienholders to justify post-petition priming where the value of the collateral is high enough above the total of all pre- and post-petition encumbrances to provide an equity cushion. *See In re Olde Prairie Block Owner, LLC*, 448 B.R. 482, 493-94 (Bankr. N.D. Ill. 2011) (noting that "a large equity cushion in the form of property value has also been found to provide adequate protection in some circumstances" and holding that the objecting creditor's interest in the debtor's single asset real estate was adequately protected by a substantial equity cushion); *In re Plaza de Retiro, Inc.*, No. 11–09–10974-SA, 2009 WL 3633356, at *4, *7 (Bankr. D.N.M. 2009) (approving a priming lien where the pre-petition creditors were protected by equity cushions of 214% and 501%, respectively); *In re Strug-Division LLC*, 380 B.R. 505, 513 (Bankr. N.D. Ill. 2008) ("An 'equity cushion' seems to be the preferred test of adequate protection required to prime a first mortgage under 11 U.S.C. § 364(d)(1)."); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (acknowledging that "[t]he existence of an equity cushion alone can constitute adequate protection"); *In re Dunes Casino Hotel*, 69 B.R. at 793 (finding that the approved financing represented only a small fraction of the collateral's lowest valuation). While there is no exact threshold at which an equity cushion will always suffice, "case law almost uniformly holds that an equity cushion of at least 20% constitutes adequate protection." *In re*

*Capitol Station 65, LLC*, No. 17-23627-B-11, 2018 WL 333863, at *11 (Bankr. E.D. Cal. Jan. 8, 2018) (citing cases).

Under a "holistic" approach used by some courts, the extent of equity cushion needed to protect existing secured creditors' interests from "being unjustifiabl[y] jeopardized" once subordinated may depend on case-specific facts such as "the likelihood that [the collateral's value] will depreciate or appreciate over time," the debtor's "prospects for successful reorganization," and "the [d]ebtor's performance in accordance with the [p]lan [of reorganization]." *In re Strug-Division LLC*, 380 B.R. at 513-14 (quoting *In re Aqua Assoc.*, 123 B.R. 192, 196-97 (Bankr. E.D. Pa. 1991); and citing *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 626); *see also In re Olde Prairie Block Owner*, 448 B.R. at 493 (citing the considerations raised in *In re Strug-Division* and concluding that the objecting creditor's adequately protected interest would not be jeopardized by allowing the proposed priming lien).

Here, Debtor asserts that it has a large equity cushion that will protect LPL's and Mason's interests even after they are primed by 364 Capital's superpriority lien. Based on the $15,400,000 As Is Value of the Property and a total secured debt of approximately $6,511,905—including all pre-petition secured debt and the maximum DIP Loan amount—Debtor estimates that its equity in the Property will be approximately $8,888,095—roughly 58% of the As Is Value.[46] Thus, with even the most junior lien being protected by a 58% equity cushion, Debtor argues that LPL's second priority interest and Mason's third priority interest will be more than adequately protected. Debtor's counsel also indicated that the equity cushion will remain sufficient to ensure all secured

---

[46] At the hearing, counsel for the Objecting Parties pointed out that the Appraisal only accounts for $500,000 in remaining soft costs for Debtor to complete the Property entitlement process, rather than the $1.15 million included for soft costs in the Amended Budget. To the extent the As Is Value should be calculated using the Amended Budget's soft costs estimates instead, the As Is Value would be $14,759,091 (without rounding), leaving an approximate equity cushion of 56%.

claims are paid in full, including interest accrued until the time of sale, if the Property is sold one or two years from now.

The Objecting Parties argue that Debtor has not satisfied its burden of proof as to the Property's value and the equity cushion because Debtor has not provided reliable evidence of what the Property would actually sell for, leaving it unclear whether there is sufficient equity to protect LPL's and Mason's interests from being unjustifiably jeopardized. Because the Property's value is key to determining the extent of any equity cushion—Debtor's sole basis for asserting adequate protection—it is relevant to review the valuation methodology relied upon in reaching that value. *See* 3 COLLIER ON BANKRUPTCY ¶ 364.05 ("Whether the existing lender's interest is adequately protected by a sufficient equity cushion turns on the valuation of the collateral, the method for which may take into account the intended disposition of the collateral.").

The value of estate property securing a creditor's lien must be "determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . . ." 11 U.S.C. § 506(a)(1). While a "forced liquidation" valuation typically yields the lowest estimation of value for a given property, a "going concern" or "fair market value" approach usually provides the highest possible valuation because it reflects the price at which the property would be sold through an arm's length transaction under normal market conditions. *See* 3 COLLIER ON BANKRUPTCY ¶¶ 361.04, 361.06; *In re Deep River Warehouse, Inc.*, No. 04–52749, 2005 WL 1287987, at *7-8 (Bankr. M.D.N.C. Mar. 14, 2005). In adequate protection disputes, parties may disagree as to which of these extremes is more appropriate to rely upon in estimating the collateral's value. *In re Deep River*, No. 04–52749, 2005 WL 1287987, at *8 ("Whether to choose the purchase method valuation, a foreclosure valuation, or some other standard depends on the particular circumstances of a case."); 3 COLLIER ON BANKRUPTCY ¶ 361.04 ("Valuation should not be used as a device to

pass the risk of continued operations to creditors, particularly the secured creditor seeking adequate protection, while at the same time premature anticipation of a possible liquidation should not permit termination of a case that could produce a higher return if continued."). "[I]n the context of reorganization with prospects for success, the fair market value is the appropriate standard of valuation." *In re Savannah Gardens-Oaktree*, 146 B.R. 306, 309-10 (Bankr. S.D. Ga. 1992); *see also In re Cohn*, 16 B.R. 140, 144 (Bankr. D. Mass. 1981) ("[F]air market value is the predominant standard of valuation . . . . [F]orced-sale value is usually only used when the property is vacant, inoperative, or must otherwise be disposed of quickly and cheaply.").

Here, Debtor's calculation of the equity cushion is based on an appraised market valuation of the Property. The appraisal comes from a qualified expert's analysis of the Property's value based on comparable sales in the Charleston area. While it has been recognized that appraisal is an "inexact science," expert appraisals are often relied upon as an effective means of determining fair market value. 3 COLLIER ON BANKRUPTCY ¶ 361.04 (noting that "[o]ther means of valuation (*e.g.,* an auction or other market test) are not really useful in the context of an adequate protection hearing").

The Objecting Parties did not raise any issues with Appraiser's use of the comparable sales approach or the comparables relied upon, but they did point to potential weaknesses in the Appraisal, including certain assumptions that, if incorrect, would change Appraiser's analysis. In particular, Appraiser admitted that if the number of single-family residential lots that can be developed on the land is less than 52—the number he obtained from Sandusky—his assessment of the Property's value could change. Additionally, Appraiser calculated the As Is Value by discounting the Property's future As Entitled Value, subtracting the time value of money and the estimated costs remaining to finish the project—costs that are subject to change. The Court

recognizes that these issues suggest that the actual current market value of the Property could be lower than the amount determined by the Appraiser.  However, Debtor does not need to prove the exact value of the Property, just that the value is sufficient enough to provide adequate protection of the pre-petition liens.  The court in *In re Beker Industries* discussed this point:

> As to the burden of proof issue, § 364(d)(2) states only that a debtor-in-possession "has the burden of proof on the issue of adequate protection." It makes no requirement that it prove up all different valuation scenarios. All that is contemplated is that it prove sufficient value under an appropriate standard; those asserting a different theory have the opportunity to cross-examine and impeach the testimony and the further opportunity to put on their own case and thereby show a different value.

58 B.R. at 737 (citation omitted).

As LPL's counsel stated at the hearing, the facts before the Court present a valuation "conundrum" [47] and, while not presenting a rebuttal valuation, LPL's counsel challenged the Appraisal on the grounds that the Property has not been "aggressively" marketed.[48]  The Court acknowledges that the valuation of the Property is not as straightforward as a typical valuation of a residence.  The Court, however, is not aware that the Appraiser's conclusion of value needs to be substantiated by the subject Property being marketed, and the Objecting Parties have not presented any authority or evidence in support of that argument.  Moreover, no issues with the actual depreciation of the current value of the property—whatever that may be—were raised, and the Court takes judicial notice (while acknowledging the current political climate and the fluctuations in the market) that the property values in the Charleston area and surroundings have

---

[47] Debtor has repeatedly characterized acquiring these entitlements as "unlocking" the Property's value.  The Objecting Parties argued that if there is value that needs to be "unlocked" before a buyer is willing to purchase the Property, it suggests the Property is not currently worth as much as the As Is Value.  The Court understands Debtor's point to be that entitlement would not only add to the Property's current value but also provide greater certainty that the property will not be sold under less favorable conditions (*e.g.* a fire sale, or with a smaller pool of buyers willing to risk finishing the entitlement process themselves) that would yield a lower sale price than is possible.

[48] To the extent that the Objecting Parties suggest the As Is Value has not been tested in the market to show that a buyer would actually be willing to pay that much for the Property today, the Court notes that expert appraisals are a commonly accepted means of determining market value of estate property in bankruptcy proceedings.

experienced a significant increase over the past few years.  The Objecting Parties did not provide

a competing appraisal or alternative theory of valuation, nor did they suggest to what extent the

As Is Value should be discounted to account for the alleged weaknesses in the Appraiser's analysis.

They also did not raise any issues with or dispute the use of the four comparable properties that

the Appraiser used to reach his conclusion of value.  In analyzing the adequate protection at issue

in this case, the Court is left with Debtor's opinion of value and the Appraisal which, for the

reasons set forth herein, the Court finds to be reliable for the purposes of deciding the DIP Motion.

Even if the Court does not accept the Appraiser's conclusion as to the Property's As Is

Value, the evidence does not suggest that the Property's fair market value is low enough to leave

the Objecting Parties without a sufficient equity cushion to protect their interests.  Using the lowest

price per highland acre from the adjusted comparable sales reported in the Appraisal ($1,177,651)

and subtracting $1.15 million for the remaining soft costs instead of the $500,000 relied upon by

the Appraiser, the resulting as is valuation of the Property by the Appraiser's methodology would

still be $14,329,209, leaving an equity cushion of roughly 54% after subtracting all pre- and post-

petition secured claims.

Additionally, the Hovnanian Offer reflects that a potential buyer was willing to pay

$12,000,000 for the Property in October 2023.  The Appraiser testified that property values in the

Charleston area have remained stable or, if anything, have increased during the past few years,

suggesting that at a minimum, the Property can fetch as much today as Debtor was offered in 2023.

Assuming a $12,000,000 fair market valuation for the Property, Debtor's equity after subtracting

all existing and proposed liens would be roughly 45% of the Property's value—still well above

the 20% threshold widely accepted as sufficient equity cushion to provide adequate protection.

Accordingly, based on the evidence and testimony presented and after consideration of all

arguments made by the parties, the Court concludes that Debtor has met its burden to prove that LPL's and Mason's interests will be adequately protected even after they are subordinated by the proposed priming lien.

## III.    The DIP Financing Meets the Debtor's Business Judgment Test

The next factor for the Court to consider is whether the proposed DIP Loan is an exercise of sound and reasonable business judgment.  "Courts have generally deferred to a debtor's business judgment in granting section 364 financing."  *In re DB Capital*, 454 BR at 822 (quoting *In re YL W. 87th Holdings*, 423 B.R. at 441).  Case law suggests that where a debtor indicates that incurring post-petition debt is necessary and reasonable for the benefit of the estate, courts should allow debtors to exercise their reasonable judgment "so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."  *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (discussing cases); *In re Farmland Indus.*, 294 B.R. at 884; *see also In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Col. 1985) (citing *Matter of Lifeguard Indus., Inc.*, 37 B.R. 3 (Bankr. S.D. Ohio 1983)) ("Only in circumstances where there are allegations of, and a real potential for, abuse by corporate insiders should the Court scrutinize the actions of the corporation.").

The Objecting Parties argue that the terms of the proposed DIP financing are unconscionable and objectively unreasonable, suggesting that Sandusky, as Debtor's sole member and manager, is not acting with sound and reasonable business judgment by requesting authorization for the DIP Loan.  In particular, the Objection asserts that the proposed interest rate of 12.5% per annum is "wholly unjustified" given that "the current Wall Street Journal prime rate [is] 7.5%" and 364 Capital is already being given a first priority priming lien.  Objection ¶ 35.  The

Objection also takes issue with extent of 364 Capital's fees, closing costs, and interest reserve to be charged against the DIP loan. *Id.* ¶ 36. At the hearing, Mason's counsel estimated that based on the amended DIP loan budget in Debtor's Exhibit 7, those amounts going back to 364 Capital upon closing totaled almost 20% of the loan's principal balance. The Objection also seems to suggest that the proposal to grant 364 Capital a superpriority lien is generally illogical given the Property's alleged equity cushion would sufficiently protect 364 Capital's interest even if it was granted a junior lien. *Id.* ¶ 34.

Compared to the terms of the LPL and Mason Loans as presented at the hearing and supported by the evidence before the Court, the terms of the proposed DIP Loan do not appear to be "unconscionable or objectively unreasonable" as the Objecting Parties argue. Objection ¶ 37. It appears that the original contract interest rate on LPL's loan to Debtor was 14% per annum, and Sandusky testified that since Debtor defaulted on the loan, LPL's claim has been accruing interest at a rate of 24% per annum. Additionally, the Settlement Statement admitted as LPL's Ex. D indicates that for its $1,865,000 loan to Debtor, LPL debited $110,650 in loan charges and $391,650 in interest reserve—together almost 27% of the principal balance. Mason's claim is also currently accruing interest at a rate of 18% per annum.

Sandusky and Renzi also provided credible testimony as to how the DIP loan's terms compare to what other lenders offer. Sandusky testified that the DIP loan's interest rate is better than any other rates Debtor has been offered, which were all in the range of 14-16% interest. Renzi testified that to stay competitive, 364 Capital monitors the DIP lending market and has observed that many DIP loans have been approved with interest rates over 14% per annum. Absent any evidence presented by the Objecting Parties to rebut the testimony presented and the record before

the Court as it stands, the Court concludes that the proposed terms of 364 Capital's loan to Debtor appear to be reasonable and within the realm of what is normal for DIP financing.

The Objecting Parties also appear to suggest that Sandusky is seeking authority to obtain the DIP financing for his sole benefit and that ultimately any increase to the Property's As Is Value from completion of the entitlement process would add to the unencumbered equity Sandusky would receive after all secured and unsecured debts are paid. As discussed in more detail *infra*, Sandusky appears to be acting in the best interest of the estate, not just himself. His rationale for seeking post-petition financing—to fund Debtor's reorganization and avoid a distress sale of the Property—is sound and reasonable under the circumstances. Based on the testimony and evidence presented, the Court is not convinced that it is unreasonable to incur the proposed debt when it seems Debtor's only alternative would be to immediately liquidate the estate, possibly to the detriment of unsecured creditors. Accordingly, the Court will defer to Debtor's sound and reasonable business judgment.

## IV.     The DIP Financing Is in the Best Interest of the Estate and Its Creditors

"A debtor's use of credit obtained through a priming lien must be likely to benefit the estate and improve the debtor's ability to reorganize." *In re Olde Prairie Block Owner*, 448 B.R. at 493; *see also*, *e.g.*, *In re Johnston Energy, Inc.*, 101 B.R. 684, 686-87 (Bankr. E.D. Okla.) (denying post-petition financing and ordering conversion of the case to Chapter 7 where rather than any potential benefit, the DIP's egregious conduct indicated a threat of immediate and damaging loss to the estate such that allowing the DIP to control the use of post-petition funds was "unacceptable"). Efforts to preserve or increasing the value of the estate's assets—even where such effects are speculative—are typically seen as beneficial to creditors and the estate. *See In re Olde Prairie Block Owner*, 448 B.R. at 495 (finding the debtor's proposed use of post-petition

credit was in the best interest of the estate even though the extent of a "possible" increase in estate property value from the debtor's proposed expenditures was "speculative and dependent on market factors").  An orderly reorganization or liquidation through a Chapter 11 plan is often in the best interest of the estate and unsecured creditors where the alternative is a forced fire sale through foreclosure.  *In re Sky Valley*, 100 B.R. at 115 (finding superpriority financing was in the best interests of creditors and the estate where "[t]he failure to undertake the projects Debtor proposes could ultimately result in a diminution in value of the resort precipitated not only by deterioration of the property but also by forcing Debtor to liquidate or refinance some or all of the resort under duress, which actions may not be conducive to reaping results favorable to existing unsecured or subordinate lenders").

The Objecting Parties argue that the proposed DIP Loan would only benefit Debtor's principal, Sandusky, and 364 Capital, with "absolutely no benefit to any of the creditors of the estate" and no creation of a going concern business for Debtor to "reorganize."  Joint Statement of Dispute at 4.  They place particular focus on the fact that, according to the Appraisal, the financing of the soft costs to complete the entitlement process would result in $2.1 million of increased value (the difference between the As Entitled Value and the As Is Value)—less than the $2.475 million in debt the DIP Loan would add to the estate's liabilities.  Moreover, the Objecting Parties argue that "none of the proposed borrowing will be used to physically improve the Real Property itself"; Objection ¶ 39.  Rather, as Mason's counsel indicated at the hearing, more than half of the DIP Loan will be used to pay fees and interest to 364 Capital as well as professional fees with no real benefit to the existing secured creditors.[49]

---

[49] In support of their argument, the Objecting Parties cite to *In re Windsor Hotel, LLC*, wherein the court noted:
The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide security for a new, post-petition

The Court acknowledges that the end goal, as reflected in the current proposed Plan and as presented at the hearing, is for Debtor to obtain the proper entitlements for the Property. Once that is achieved, Debtor would either (a) refinance the loans, paying off the existing creditors and 364 Capital, or (b) market and sell the Property, at which point, according to the Appraisal, it would sell for a higher price and result in a larger recovery. The fact that such result may yield a higher profit for Sandusky, by itself, does not lead to the conclusion that there would be no benefit to the estate.

As Debtor's counsel argued at the hearing, any recovery to Sandusky would be further diminished the longer the Objecting Parties' loans are not repaid, as interest is continuing to accrue on LPL's and Mason's Loans at the default rates of 24% and 18%, respectively. Assuming the sale or refinancing of the property occurs within 12 months as projected, the default interest added to LPL's claim would be approximately $810,000, and for Mason it would be approximately $204,000, adding over $1 million in debt to be repaid. To the extent that the sale or refinancing occurs within two years, the default interest added to Debtor's debt would be approximately $1 million for the LPL Loan and $240,000 for the Mason Loan. Combined with the extension fee and interest that would accrue on the DIP Loan, the total amount of debt to be repaid would be approximately $11,500,000—including the unsecured debt—which would be sufficiently covered by the equity cushion but may or may not leave Sandusky with as large an equity value as his interest in Debtor is worth today.

---

lender. When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied.

295 B.R. 307, 315 (Bankr. C.D. Ill. 2003). The Court agrees with that holding but notes that its application to the facts in the instant case is inapposite. In *In re Windsor Hotel*, the court concluded that there was no equity cushion to provide the existing secured creditors adequate protection, whereas the Objecting Parties are adequately protected by a large equity cushion. Moreover, for the reasons set forth herein and based on the record before it, the Court cannot similarly find that granting the DIP Loan and priming existing liens would be tantamount to transferring the risk of loss to the existing secured creditors.

Based on the testimony and evidence admitted into the record, the Court cannot conclude at this time that Debtor is purposefully delaying the Objecting Parties' recovery—or any other existing creditor's recovery, for that matter—by retaining the Property and infusing more financing into it so that ultimately it can be sold for a higher price to the sole benefit of Debtor's only equity holder.

## V.   The DIP Financing Is Not a *Sub Rosa* Plan

The Objecting Parties lastly oppose the DIP Motion by arguing that the proposed DIP financing is in effect a *sub rosa* plan or plan in fact.   "When a transaction or settlement in bankruptcy has the effect of dictating some of the terms of any future reorganization plan, a court deems the transaction impermissible because it short circuits the requirements of Chapter 11 . . . by establishing the terms of the plan *sub rosa* in connection with a [disposition] of assets." *In re Energy Future Holdings Corp.*, 648 Fed. Appx. 277, 284-85 (3d Cir. 2016) (internal quotations marks and citations omitted).   "[A] bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *In re LATAM Airlines*, 620 B.R. at 815-16 (quoting *Resolution Tr. Corp. v. Official Unsecured Creditors Comm.* (*In re Def. Drug Stores, Inc.*), 145 B.R. 312, 317 (9th Cir. BAP 1992)).   "Thus, courts will reject proposed DIP loans as improper *sub rosa* plans where the terms of the loan include concessions to creditors or parties in interest that are unauthorized under, or in conflict with, provisions under the Bankruptcy Code." *Id.* at 816 (citing example cases) (italics added).   "While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender." *In re Def. Drug Stores*, 145 B.R. at 317; *see also*

39

*In re Chevy Devco*, 78 B.R. 585, 590 (Bankr. C.D. Cal. 1987) (denying post-petition financing where the creditor being subordinated did not have adequate protection and was "being made to subordinate so that those with lower priority"—the debtor's owners—could "potentially make a profit"). The *sub rosa* doctrine also prohibits efforts to restrict creditors' right in Chapter 11 to vote on a proposed plan of reorganization. *In re Roman Cath. Diocese of Rockville Ctr.*, 665 B.R. 71, 88 (Bankr. S.D.N.Y. 2024).

Here, the Court finds *In re Sky Valley* persuasive. *See* 100 B.R. at 115. In that case, the objecting senior lienholder argued that the debtor's financing proposal was in reality a plan of reorganization that the debtor sought to implement without undergoing plan confirmation. *Id.* The court rejected such argument, explaining:

> Debtor's proposal for superpriority financing is intended to be a short-term, stop-gap measure to enable Debtor to maintain and perhaps enhance the value of its property while undertaking to formulate, negotiate and bring to a confirmation hearing its overall plan for reorganization. The infusion of only $400,000 in capital into an enterprise valued at $10.5–12 million does not constitute a plan of reorganization. If it did, the provisions of 11 U.S.C. § 364 would be meaningless in a Chapter 11 context without further specific limitations within § 1129 on the use of § 364.

*Id.* Similarly, the DIP Loan proposed in the instant case represents a small fraction of the estate's total value. While it makes reorganization possible, the DIP Loan does not dictate how the plan of reorganization needs to be; rather, it gives Debtor more options for how to proceed than Debtor would have without the financing, in which case Debtor's counsel indicated the only option would be to liquidate the Property. And though the arrangement will allow for the subordination of the Objecting Creditors' liens on the Property, it does not take away creditors' rights to vote on Debtor's plan of reorganization. Thus, the Court finds that the proposed DIP financing does not constitute a *sub rosa* plan.

## CONCLUSION

The Court has thoroughly analyzed the record before it. Its conclusion was reached after a painstaking review of the evidence presented, taking into consideration where the burden of proof falls. As courts have repeatedly acknowledged, valuations are not an exact science. Courts usually rely on expert testimony, taking into consideration the arguments and shortcomings in appraisals, as raised by the opposing parties. For the foregoing reasons, the Court concludes that Debtor has satisfied its burden under § 364 and the DIP Motion should be granted. The Objection is hereby overruled, and the DIP Motion shall be granted pursuant to the order filed concurrently with this opinion.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**04/18/2025**



Entered: 04/18/2025

Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina